[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
Attorney Van der Werff Attorney Shapera Attorney Meisler Attorney Terry
MEMORANDUM OF DECISION
NATURE OF PROCEEDING
On June 17, 1988, petitions were filed by the Commissioner of the Department of Children and Youth Services (DCYS) alleging that Holly K., whose date of birth is August 15, 1985, was uncared for and neglected. On that same date the court (Conway, J.) granted an ex parte Order of Temporary Custody. That Order was continued by the court on June 23, 1988.
On August 22, 1988, a coterminous petition seeking to terminate the parental rights of Francis K. and Cynthia B. with respect to Holly K. was filed by DCYS pursuant to section 17-43a(e) of the General Statutes. The petition for Termination of Parental Rights alleges as a single ground for termination that the child "has been denied by reason of act or acts of commission or omission, the care, guidance or control necessary for her physical, moral or emotional well being", and requests a waiver of the one year requirement pursuant to General Statutes 17-43a(c) and 45-61f(g).
On June 29, 1990 the petitioner withdrew the neglect petition dated June 17, 1988 and the court (Brenneman, J.) transferred the Order of Temporary Custody to the pending coterminous petition.
Immediately prior to the beginning of trial the petitioner orally indicated that it would not seek to terminate the parental rights of the mother, Cynthia B., but was proceeding only against the father, Francis K. The coterminous trial begin on July 17 and was concluded on July 19, 1990.
PROCEDURE TO BE FOLLOWED CT Page 1010
Where neglect and termination petitions are coterminously filed under section 17-43a(e), the court is required to proceed in three separate stages.
First — Adjudication of the neglect petition.
The court must determine, by a fair preponderance of evidence, if the child has been neglected or uncared for as of the date the petition was filed or was last amended. Neglected includes abused as that term is defined under the statutory definitions found in Section 46b-120 and Section 17-38a(b). If the petitioner's evidence does not support such a finding, then both petitions must be dismissed since both are based upon the same alleged facts. If the court finds the child to have been neglected or uncared for, disposition will be deferred until a decision is rendered on the termination petition.
Second — Adjudication, termination petition.
The court must next determine whether the evidence provides clear and convincing proof that any pleaded ground exists to terminate the parent's rights. If no such ground is found, the court must return to the neglect petition to consider an appropriate disposition. If grounds to terminate are found, it must move to the final stage.
Third — Disposition, both petitions.
If grounds are found to both adjudicate the child neglected or uncared for and to terminate the rights of the parents, the court must then consider whether the facts as of the date of disposition — the last date of hearing — support by clear and convincing proof, after consideration of the six factors enumerated in Section 45-61f(h), that such termination is in the child's best interest. If the court does not find that the child's best interests would be served by terminating the parent's rights, it must return to and dispose of the neglect petition. If the court does find that termination serves the child's best interests, an order may issue terminating the parent's rights.
FACTS
The testimony presented and the exhibits received during the course of the trial support the finding of the following facts by the court.
On June 13, 1988 Joyce Downing, Holly's babysitter, took Holly to the Pediatric Clinic in Willimantic for a routine physical examination and to check on a complaint by Holly of a burning sensation during urination, and a vaginal discharge. (Petitioner's exhibits B and G) Dr. Sara Elbaum examined Holly at the clinic and observed an unusually large vaginal opening given the age of the child, along with considerable vaginal irritation. She referred the child to Dr. Gregory Runkel, a pediatrician, who upon examining CT Page 1011 Holly on June 13, 1988 found physical evidence consistent with long term sexual abuse. Specifically, both in his written report (Petitioner's exhibit B) and his testimony, which the court finds credible, Dr. Runkel indicated that Holly readily allowed him to perform a genital vaginal examination by lying down and spreading her legs apart and allowing him to manually examine her. He found this to be unusual in a child of her age suggesting that she had done this before. Dr. Runkel observed an irregular vaginal opening of about 8-10mm with thickened edges. "There were vaginal adhesions at approx. 2, 4 8 o'clock" all of which he testified were consistent with repeated, long term sexual abuse. In his opinion, the adhesions were most likely caused by tearing upon penetration with an object, finger, or penis. The condition of the adhesions would indicate that they were several months old. Dr. Runkel had previously examined Holly in December, 1986 and found her genital vaginal area to be normal on that occasion.
While spreading Holly's labia for the purpose of conducting his examination Dr. Runkel asked Holly if anyone had done anything like what he was doing and she replied, "Yes, Daddy does".
The child told DCYS intake worker Marvin Gregory that the doctor touched her "down there" but that "Daddy touches me down there too." (Petitioner's exhibit G)
Joyce Downing, who had been Holly's babysitter for more than one year prior to June, 1988, noticed unusual sexual behavior on the part of Holly for some time prior to bringing her for the physical examination. She observed Holly masturbating frequently, even during her naps. On one occasion when she observed Holly masturbating Holly said, "daddy does this to me". On another occasion Holly told Ms. Downing that her father had been doing things to her, indicating with her hands between her legs. When questioned by Ms. Downing she would insist that her "Daddy did it", never anyone else.
Apparently Ms. Downing did not completely believe Holly although she was concerned to the point of telling Francis about Holly's behavior and asking Francis whether he had any "dirty" books or movies in the house. She also testified that Holly used inappropriate sexual terms and seemed to know more than a three year old should. Although it was obvious to the court that Ms. Downing was too embarrassed to state in court exactly what terms Holly had used, she is reported to have told the DCYS social worker that Holly had told her that "Daddy eats me out." (Petitioner's exhibit G). The court takes note of the fact that colloquially this term refers to the act of cunnilingus.
The respondent would have the court believe that Holly's use of the term "eat me" comes from a book entitled, Journey Cake Ho! (Respondent's exhibit B) which is a story about a boy attempting to catch and eat a cake which is rolling away from him. The term "catch me and eat me" is used frequently in the story. However, the term as used in the story is not sexual in nature. The court was unable to find in Petitioner's exhibit B CT Page 1012 the term "eat me out" or the use of the verb "eat" with respect to anything other than the "Journey Cake". Certainly, no person or part of the human anatomy was referred to as being eaten in the book. Consequently, the court does not accept respondent's explanation of the child's use of the term "eat me out" as having been derived from this book.
Ms. Downing's testimony, and that of the grandmother, is consistent with the testimony of Diane Thompson, a clinician who was Holly's therapist from September through November, 1988. She testified that Holly used such terms as "Eat my heine". When Ms. Thompson asked Holly where she lived Holly answered, "I live with my grandmother because my daddy hurt me" and pointed between her legs. Ms. Thompson also observed repeated incidents of masturbation by Holly. During a period of therapy which involved drawing pictures Holly drew her father with his penis showing and called it his "tail".
Holly told DCYS social worker Patricia Bradley that "daddy hurt me." When asked where, she grabbed her vagina. When asked how, she said "daddy hurt me with his fingers" and grabbed her vagina. Holly told Ms. Bradley that she said "No daddy don't". She said, "Daddy put his tail in here and I cried and told daddy no! it hurts. . ." (Petitioner's exhibit G) When working with anatomically correct dolls Holly identified the boy doll as her daddy and its penis as daddy's "tail". She stuck her finger inside the vagina of the girl doll and indicated that was where her daddy put his finger. Holly told Ms. Bradley that "Daddy hurt me in his bed". (Petitioner's exhibit G)
The child's maternal grandmother testified that when Holly was first placed with her in June, 1988 she was sexually very active in that she would try to touch the genital area of her brother Orson, then age 8, and sister Emily, then age 11. She also wanted to perform cunnilingus upon Emily. The grandmother's testimony, which the court finds to be credible, also indicates that Holly was a very disturbed child when first placed with the grandparents. In addition to the sexual behavior, she would not relate at all to adult men, and she would not accept gifts from anyone. For the first few months of the placement Holly needed to be reassured every time that she left her grandmother's house that she would be brought back to grandmother's house. In addition, very soon after her placement she stopped calling her father "daddy" and began calling him Francis. She indicated that she did not want to see her father and became very upset when told that she would be required to visit with him for court ordered evaluations. In fact, she would not do so for the first evaluation in August, 1988 unless her grandmother was physically in the room with her at the time of the visit. Even with respect to the second evaluation of May, 1989, almost two years after being placed with her grandmother, she became very upset upon being told by her grandmother that she would have to see her father and she agreed to do so only upon being assured that her grandmother would be right outside the door.
CLINICAL EVALUATIONS CT Page 1013
On August 5, 1988 a court ordered psychological evaluation of Francis, Holly and the maternal and paternal grandparents was conducted by Dr. Bruce Freeman, a licensed clinical psychologist. His report has been introduced into evidence as Petitioners exhibit A and has been carefully considered by the court.
It is clear from Dr. Freeman's report and testimony (as well as testimony from Holly's grandmother) that on the date of the evaluation Holly was afraid of her father and did not want to see him. When told that she was to visit with him she became upset and began to cry. She would only agree to see him if her grandmother was present in the room. When Francis first arrived Holy would not even acknowledge him but after being encouraged and reassured she began to respond to and interact with him. She told her father that she was afraid of him.
Francis indicated to Dr. Freeman that he never sexually abused Holly. He had no rational explanation as to who might have done so except to say that it might have been her half-sister, Emily, or other persons he couldn't or wouldn't name. No evidence of significant psychopathology were found by Dr. Freeman in his examination of Francis. In his summary and recommendations Dr. Freeman concludes:
 Nothing (Francis) offered during this evaluation gave any other plausible explanation for all this evidence other than his having abused (Holly). . . . While the verbal testimony of a two year old can be contradictory, undependable, and change quickly, Holly's accounts have been consistent, direct, and reliable, both in her accounts of what happened, and in her pointing to her father as the perpetrator.
 Francis (K.) has denied his sexual abuse, and seems unlikely to admit that he abused Holly. . . . [S]hould he continue to deny the abuse, and refute treatment . . . further contact between father and daughter would be harmful to Holly since it would threaten her basic security and trust in people.
In May, 1990 a second court ordered clinical evaluation was conducted by Dr. Ronald D. Anderson, a licensed clinical psychologist who specializes in forensic psychology involving sex abuse cases. Dr. Anderson's report has been introduced into evidence as Petitioner's exhibit E and has been carefully considered by the court. In general, Dr. Andersons findings and conclusions support those of Dr. Freeman. While Holly appeared to be better adjusted than she was when seen by Dr. Freeman 21 months previously, it is clear to Dr. Anderson that contact with her father remained harmful to her psychological and emotional well being. A portion of Dr. Anderson's conclusions are reproduced for emphasis.
 Holly's emotional well-being will depend on her developing an inner sense of safety which in turn, depends on the quality of her CT Page 1014 relationship with her adult protectors. When a protective relationship becomes an exploitive, abusive one, tremendous harm is done to the child. . . . Holly's apparently good adjustment should not be taken as a complete resolution of the trauma she has experienced. Her problems will return as she matures and is able to make greater sense of what happened to her. However, under the present circumstances, continued visitation with her father is expected to be very disruptive to the process of recovering from her trauma, and would instead represent some continuation of that trauma. . . . Visitation with her father should be considered detrimental to Holly's welfare for the foreseeable future.
Dr. Anderson testified that even if Francis acknowledged his sexual abuse of Holly at this time, he would require several years of therapy before visits and the re-establishment of a relationship with Holly could reasonably be considered.
Evidence presented to this court in the form of both testimony and exhibits indicates significant improvement in Holly's behavior and adjustment over the two years that she has been in the care of her grandmother. It was obvious to the court that the grandmother lives and cares deeply for Holly, and, there is every indication according to the DCYS reports that her love is reciprocated by Holly. Yet, even after two years, Holly still does not want to talk about her father nor be reminded of the past.
ADJUDICATION — NEGLECT PETITION, ON FACTS AS OF AUGUST 22, 1988
Mother: The petitioner has not presented sufficient credible proof to convince the court by a fair preponderance of the evidence that the child has been denied the care guidance or control necessary for her physical, moral or emotional well being by reason of act or acts of commission or omission, of her mother, Cindy B. Since this was the only ground pleaded as to the mother, and since the petitioner has indicated that it is not seeking to terminate the mother's parental rights, the court orders the petition, as to Cindy B., to be dismissed.
Father: The exhibits and the testimony is replete with instance after instance of the child's constant and consistent statements to numerous individuals that her father, and no one else, repeatedly subjected her to sexual abuse. In addition, her accusations are supported by medical evidence indicating repeated, long term, sexual abuse.
Having assessed and evaluated the credibility of the witnesses, and weighed and considered the sufficiency of all of the evidence, the court finds that the petitioner has proven by far more than a fair preponderance of the evidence that Francis K. has committed repeated acts of sexual abuse upon Holly. Consequently, the court adjudicates Holly K. to be a neglected child. CT Page 1015
ADJUDICATION — TERMINATION PETITION, ON FACTS AS OF AUGUST 22, 1988
The petitioner has established by clear and convincing evidence that as the result of acts of commission or omission by her father, Holly has been denied the care, guidance or control necessary for her physical, moral or emotional well being. The court finds that Holly's behavior both prior and subsequent to her placement is clear and convincing evidence that the child's physical, moral and emotional well being had been negatively affected by the repeated acts of sexual abuse to which she had been subjected. In addition, the court finds that Holly's consistent and repeated accusations of sexual abuse by her father, coupled with the clinical and medical evidence to which the court attaches great weight, clearly and convincingly proves that Francis K. sexually abused his daughter over a period of time while she was in his care. Consequently, the court finds that the petitioner has proven by clear and convincing evidence the pleaded ground for terminating the parental rights of Francis K.
WAIVER OF ONE YEAR REQUIREMENT
At the close of the petitioner's evidence, the respondent-father moved to dismiss the termination petition on the ground that there was insufficient evidence to waive the one year requirement. The court reserved judgment on this oral motion pending the submission of post-trial briefs; however, the respondent did not address this issue in his brief. Since the court finds sufficient grounds for waiting the one year requirement, the motion to dismiss is denied.
When considering a termination petition alleging acts of commission or omission involving repeated instances of sexual abuse upon a three year old child it is logically absurd to require that such acts have existed for more than one year before seeking to terminate the rights of the parent responsible for said acts. A three year old child who has been the subject of repeated sexual abuse by a parent should not be required to wait one year before being assured of a permanent, safe and secure home.
In the instant case it is unknown whether the acts of sexual abuse of Holly by her father existed for more than the required one year; therefore, it is necessary for the court to determine whether from the totality of circumstances surrounding the child a waiver of the one year period of time would be in the best interest of the child. In Re Saba P. 13 Conn. App. 605
(1988).
The court has found clear and convincing evidence that as of the date of the petition Francis K. had committed repeated acts of sexual abuse upon his daughter. Yet, in spite of the overwhelming evidence to the contrary, Francis has consistently denied having sexual contact with his daughter, and has refused to enter treatment. Even were he to enter a treatment program for sex abusers such treatment would require between two and three years before any contact could take place between father and Holly. Without such treatment Dr. Anderson believes, and the court concurs, that it would be CT Page 1016 harmful to Holly to have any contact with her father. No purpose would be served by waiting the one year. The court finds that based upon the totality of the circumstances it is in the best interest of the child to waive the one year requirement and the requirement is therefore waived.
DISPOSITION — ON FACTS AS OF JULY 19, 1990, THE LAST DAY OF TRIAL.
Since her placement with her maternal grandmother two years ago, Holly has improved both behaviorally and developmentally. During that same period of time Francis has consistently denied abusing Holly. It is unlikely and unrealistic to expect him to now admit that abuse, and without such an admission, which is a prerequisite to meaningful and prolonged psychiatric treatment, Holly cannot safely be returned to his care. Dr. Anderson's evaluation of Holly almost two years after placement is that, ". . . her interest would best be served by a prolonged period of separation from her biological father." (Petitioner's exhibit E). The court concurs with this conclusion having previously determined that contact between Holly and her father at any time during the foreseeable future would be detrimental to the child.
Before considering terminating a parent's rights, however, the court must consider the six factors set forth in Section 17-43a(d):
 1. The respondent was offered the services of DCYS for supervised visitation with Holly in June, 1988, shortly after placement under the Order of Temporary Custody, but he refused. No other services were offered to facilitate reunion.
 2. No court orders were entered except to attend court and the clinical evaluations, which the the respondent attended.
 3. The child has no positive feelings for her father: she expresses fear of him and does not want to see him. Holly has developed strong emotional feelings and ties with her grandmother with whom she has been placed over the past two years.
4. Holly was born on August 15, 1985. She is five years old.
 5. The respondent has made no effort to adjust his circumstances or conduct to make it in the best interest of the child to return to his home in the foreseeable future. Contact and communication with the child have been prohibited by court order as being detrimental to the best interests of the child.
 6. The respondent has not been prevented from maintaining a meaningful relationship with Holly due to any unreasonable act or conduct by any other person or by economic circumstances.
JUDGMENT CT Page 1017
Having considered the foregoing, it is found by clear and convincing evidence to be in the best interest of Holly K. for her father's parental rights to be terminated. Although adoption is not presently being contemplated in this case, as the parental rights of the child's mother are not being terminated, it is clearly in Holly's best interests to have the parental rights of her father terminated so that she may be raised in a safe, secure, nurturing environment. See: In Re Rebecca W., 8 Conn. App. 92
1986).
It is therefore ORDERED that the parental rights of Francis K. in and to his daughter Holly K. are hereby terminated.
In her post-trial brief, the respondent-mother expressed her desire to have Holly continue to reside with the maternal grandmother and joined with the petitioners proposed disposition that guardianship be transferred to the maternal grandparents. The court agrees that this would be the most beneficial arrangement for Holly as it will provide continuity and security for her in a loving and caring environment. Therefore, it is further ORDERED that the guardianship of Holly K. be transferred to the maternal grandparents, Fredrick and Emily Bailey.
Dated at Willimantic this 20th day of August, 1990.
TERENCE A. SULLIVAN, JUDGE